# United States District Court
# District of Massachusetts

| | |
|---|---|
| **RAYMOND BAZINET,**<br>            PLAINTIFF,<br><br>                        v.<br><br>**DR. JOSEPH P. BURKE,**<br>**SUPERINTENDENT OF SCHOOLS,**<br>            DEFENDANT. | **CIVIL ACTION NO.  05-40041-MAP** |

### DEFENDANT'S MEMORANDUM IN SUPPORT OF
### MOTION FOR SUMMARY JUDGMENT

*Statement of the Case*

In this case, a former teacher who was not rehired after his employment contract expired, has filed a complaint alleging damage to his reputation caused by the superintendent's failure to remove "fallacious documents" from his personnel file, that "plaintiff was never able to rebut in a proper forum". The defendant Superintendent of Schools has denied the claims and now moves for summary judgment after discovery.

While plaintiff does not state the basis for his claim that the defendant violated his civil rights, one can infer that he is alleging a violation under 42 U.S.C. § 1983. Proceeding on this assumption, the defendant submits that plaintiff has failed to articulate any rights, which were violated by the defendant.

*Factual Background*

The material facts in this case are set forth in the Statement of Facts submitted with this memorandum (with exhibits) and have been obtained through discovery. It is defendant's contention that the facts indicate that no due process violation of civil rights

51102

occurred in "retaining documents" or other actions relating to plaintiff's complaints against Dr. Burke regarding his former employment. Those facts are summarized here.

Plaintiff acknowledges that he does not seek reinstatement. As he testified in his deposition:

```
15        Q.   Now, if I understand you, you are not
16     contesting the right not to rehire you?
17        A.   No.  Why should I?  She has every right
18     not to rehire me.  That is not in dispute.  That is
19     a matter of like -- you are talking whatever, school
20     rules or stuff like that.  She -- she earned that
21     right, and I respect that right.  If she thinks I am
22     a lousy teacher, she gives me two bad reviews in a
23     row, you're history, that's life.
```

(Bazinet Depo p. 61).

He does not articulate any particularized complaint, but appears to be upset that two complaints were filed against him while he was teaching, involving allegations of sexism and racism. At his deposition he articulated his complaint as follows:

```
3         Q.   So if I understand -- so what is your
4      complaint?  Is your complaint that Dr. Burke refused
5      to meet with you?
6         A.   No, my complaint is that under federal
7      statute I am due a hearing.  I am still in the file
8      as a sexual predator and a racist.  They carry on to
9      this very day, the same problems that I have told
10     him about.  You cannot do this under federal
11     statute, as I understand it, without giving me a
```

51102

```
12      hearing.  I need to confront the people, they need
13      to document what they are saying, and then I need to
14      show they are liars.  (Bazinet Depo.  p. 59)
```

Despite Mr. Bazinet's claim that he is entitled to a "hearing" he acknowledged that he did not receive any discipline over either complaint. (Bazinet Depo p. 59-61). Further, he acknowledges several meetings with school administrators concerning the allegations. The documents from his personnel file submitted as exhibits with the statement of material facts show that Bazinet received notice and opportunity to be heard.

For example, with regards to complaints that he was "racist", as noted in the attached Exhibit 7 *(Letter dated January 28, 2004 from Central High Administration Team to Mr. Bazinet)* after meeting with administrators, Mr. Bazinet agreed to refrain from using the alleged racist term in all his classes. Mr. Bazinet was afforded the opportunity for union representation but declined in favor of having his department chairperson present. Further the letter informed Mr. Bazinet that he should contact the administrators if he had any question concerning the statements he made.

Further, as noted in Exhibit 8 (*Letter Dated February 9, 2004 from Dr. Budd Jackson and Ms. Benoit to Mr. Bazinet)*Mr. Bazinet was notified of a meeting held on February 12, 2004 concerning the alleged statements he made to his class. The letter invited Mr. Bazinet to seek union representation. Bazinet attended and acknowledged in his deposition that he failed to file a union grievance. (Bazinet Depo. p. 45)

In Exhibit 10 (*Letter Dated February 12, 2004 from Dr. Budd Jackson to Mr. Bazinet)* Dr. Budd-Jackson requested a written explanation concerning the comments allegedly made by Mr. Bazinet.

51102

In Exhibit 11 (*Letter Dated February 13, 2004 from Mr. Bazinet to Dr. Budd Jackson*) Mr. Bazinet explained his comments and the allegations.

Bazinet further complains that, when seeking employment subsequent to his work in Springfield, he went to a job interview in another School District, which he describes as favorable, he contends that he did not get the job, by inference he is alleging that the information contained in his personnel file was disclosed to the potential employer, causing the potential employer to change his mind. (Bazinet Depo. pp. 57-58).

Viewing such claims in a light most favorable to plaintiff, defense counsel assumes plaintiff is asserting a due process claim, alleging a protected liberty interest in his reputation.

As noted in the following deposition testimony, Plaintiff apparently claims that a communication by someone from Central High School department of the allegations against him can be inferred. While there is no admissible evidence to support any such claims, plaintiff relies on totem pole hearsay statements he claims were made to him by an unidentified person at Central High School.

Not only is such evidence inadmissible, Plaintiff fails to allege that Burke made any statements or directed others to make any statements, positive or negative, to anyone.

```
2          Q.   Now, are you claiming damages against Dr.
3     Burke?
4          A.   Of course.  I've been damaged in many
5     ways; psychologically, emotionally, unable to secure
6     employment, probably.  I drove up to a school in the
7     summer that year, and the guy needed a math teacher
8     bad.  They needed somebody who could teach science.
9     I can teach that.
```

51102

```
10         Q.    What school?
11         A.    Offhand, --
12         Q.    What state was it in?
13         A.    Massachusetts.
14         Q.    What city was it in?
15         A.    Regional school up toward New Hampshire
16    border where I lived, which was going to be good
17    because I could stay in New Hampshire and teach
18    there.
19         Q.    And did you apply for a job there?
20         A.    I went in, I made out an application.
21    Somebody called the principal.  Rob Morrill is his
22    name.
                                                    56
 1         Q.    He's the principal where, at the school
 2    where you applied?
 3         A.    Yep.  It will come to me.
 4         Q.    All right.  And you say somebody called
 5    the principal?
 6         A.    Yeah.  I was filling out the application,
 7    and you know how the personnel usually are really
 8    good, they know everything that's going on in the
 9    school, the regular personnel, clerks and whatever,
10    and somebody's always running that school from the
11    office anyway, because the principal doesn't have
12    time.  And they call them up, say "You need to come
13    out and talk to this guy".  He came out, we talked
14    for a couple minutes.  He says "Come in the office."
15    We talked for a half hour.  He knew me like I
16    couldn't believe.  And Damirscotta was where he was
```

51102

```
17    from, and I had mispronounced the name, and he
18    corrected me.  And we talked about sports, we talked
19    about teaching.  We spent a good 20 minutes.  He
20    needed a special person, somebody that could walk in
21    the door -- this was a few days before opening --
22    teach some lower level kids and also do some science
23    stuff.  I can do science.  No good in the labs, but
24    I can do the science part, and I can do the math
                                                        57
 1    part.  And, you know, very happy, he said "All I
 2    need from you is you need to write a letter, because
 3    I need it officially that you are applying for this
 4    job, and bring it to me tomorrow."
 5         Q.   And did you do that?
 6         A.   I did.  I walked in the building, gave him
 7    the letter.  I have a copy of it somewhere.  You
 8    maybe even have it, I'm not sure.  And I said "Can I
 9    see Mr. Morrill?"  And they said no, and they were
10    very different.  They were very cool to me.  And I
11    said "Is there a problem", and one of them indicated
12    that there was a problem, said "I think there is a
13    problem, and he's not willing to meet with you."
14    That's how they put it.  "He's not willing to meet
15    with you."  I said "Do you still want this letter",
16    they said, "Yeah, we'll take the letter".  Called
17    him.  No response.  Wrote to him.  No response.
18         Q.   And did you get a response to your letter?
19         A.   I did not.  My letter was a letter that
20    said I will accept the job, I am applying for the
```

```
21      job, blah, blah, blah.  That was the end of that.  I
22      called the school, apparently somebody down the
23      school, I can't say who it was --
24         Q.  You called what school?
                                                       58
 1         A.  Central High.  And they said, "Well, yeah,
 2      he called."  And he talked to the new principal
 3      there, I forget his name.  He's the -- he's still a
 4      principal there.
 5         Q.  You made a call to Central High --
 6         A.  Yeah.
 7         Q.  -- to try to confirm whether --
 8         A.  Yeah.  And I wanted to go see the
 9      principal there, and they said, "No, he doesn't want
10      to see you", and they said that, yeah, Mr. Morrill
11      had called him.  That is all they could tell me.
12      And the principal didn't want to see me.
13         Q.  And what does Dr. Burke have to do with
14      that?
15         A.  Nothing.
```

There is no evidence that Burke disseminated, and plaintiff does not allege, or present any evidence of, conduct by Burke or anyone at his direction.

Here, the allegedly defamatory information is supposedly contained in statements held in plaintiff's personnel file. There is no indication that the personnel file was ever disseminated to anyone outside of the School Department. Plaintiff's speculative claims can be inferred from the above referenced deposition testimony, that dissemination of information from the file can be inferred by an alleged change in attitude by a prospective

51102

employer when he was seeking a teaching job in 2004.

Even assuming that the file contained documents with false information that could possibly be the basis for a defamation claim, there has been no discovery provided to defense counsel which indicates any information contained in the files was ever disseminated, particularly by Doctor Burke or at his direction.

Even if it was disseminated, there is no evidence that such dissemination was "recklessly" published. There is no evidence that, assuming such evidence was disseminated, that is was causally related to the plaintiff not obtaining employment two years ago. Under these circumstances, dismissal of the complaint is warranted.

In support of what can be loosely interpreted as a conspiracy claim against the defendant, plaintiff testified at his deposition that he was "targeted" by the Principal he worked under, Ms. Budd-Jackson:

```
10        Q.   All right.  And this targeting that you
11   feel occurred --
12        A.   I didn't know at the time I was being
13   targeted.  I didn't know that he was in cahoots with
14   her, and I'm still not positive.  Only way I'll know
15   is if people come to court and answer truthfully.
16   That is the only way I'll know.  But it sure seems
17   it after adding up all the threats.  I did not come
18   to this conclusion until my third year.  And I
19   wasn't even sure of it then.  And now the further I
20   look into it, the more threads I see, the stronger
21   they are.  And they imply a conspiracy started by
22   Dr. Jackson abetted by subordinates who felt in her
23   debt or duty or whatever.  And that's what blew my
```

51102

24   mind away that last day of school.

36

1    Q.   What was the conspiracy, what was the
2    purpose of this conspiracy?
3    A.   You'd have to ask them.  I have no clue.
4    I think she just wanted to get me out.  She had
5    moved other people, I saw her do that, now that I
6    think about it.  And I wasn't moving.  I was very
7    happy with the math department, very happy with my
8    job.  If she wanted to cite me for not being a good
9    teacher, I had to accept that fact, and I was ready
10   to accept that fact.
11   Q.   Who were the conspirators?
12   A.   In my opinion it started with Dr. Jackson,
13   and the other ones could have been unwitting.
14   Q.   Who were the other ones?
15   A.   I would say Mr. Doty was probably one,
16   there was a vice president that died, he was
17   definitely one.  He burst in my classroom one day
18   for no ungodly reason and totally disrupted it and
19   scared the daylights out of the kids so that I had
20   to spend the next 15 minutes calming them down.  He
21   died.  I forget his name.
22   Q.   Were there any other conspirators?
23   A.   Let's see.  The assistant superintendent
24   would have to be, because he came in the third year.

37

1    Q.   Who was that?
2    A.   Since the second year didn't work, the
3    third year would have been when she brought in the

51102

```
 4      assistant superintendent, which really shocked me.
 5          Q.  Who was the assistant superintendent
 6      that --
 7          A.  I have no idea what his name is.  Black
 8      fellow.  Very nice guy.
 9          Q.  Mr. Coleman?
10          A.  Mr. Coleman.  He was the last year of
11      retirement.  I can see why he did it, what the heck,
12      he's retiring in December.  His friend.
13          Q.  And what did he do to --
14          A.  He didn't do anything to me except accuse
15      me of being a racist, said he was investigating it.
16      I said "fine, investigate it".
```

The defendant Burke is not alleged to have participated in any "conspiracy" or targeting. The defendant presumes that plaintiff is attempting to assert a claim for civil rights conspiracy.

Under the above circumstances, without any underlying violation of civil rights, no meritorious claims can be maintained against the Superintendent.

### Argument

**1.)  Civil Rights Claims against the defendant must be dismissed**

The civil rights claim against the defendant must be dismissed. No civil rights violations with merit have been articulated and supported with factual evidence. Even interpreting the confusing complaint liberally, and assuming that plaintiff seeks to sue the defendant individually, the action must still be dismissed because plaintiff has failed to state any claims against the individual upon which relief may be granted.

While plaintiff does not state the basis for his claim that the defendant violated his

51102

civil rights, one can infer that he is proceeding under section 1983. Proceeding on this assumption, the defendant submits that plaintiff has failed to articulate any rights, which were violated by the defendant.

A court must take special care when viewing a pro se litigant's complaint which, however inartfully pled, is held to a less stringent standard than formal pleadings drafted by lawyers. *Haines v. Kerner*, 404 U.S. 519, 520 (1972), see also, e.g., *Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). In addition, civil rights claims facing motions to dismiss are subject only to normal standards of pleading found in Fed. R. Civ. P. 8 (a) (2). *See Leatherman V. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168 (1993). Nonetheless, even a civil rights plaintiff proceeding pro se is required to allege facts, and not mere conclusions, in support of his claim. *Gallego v. Wilson*, 882 F. Supp. 1169, 1172 (D. Mass. 1995); *see also Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 28* (1st Cir. 1996). The pleading requirements, though minimal, "are not nonexistent. . . . A plaintiff is nonetheless required to set forth factual allegations, either direct or inferential, respecting factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Fisher v. Flynn,* 598 F. 2d 663, 665 (1st Cir. 1979) (even pro se complaints based on civil rights statutes must do more than state simple conclusions; they must at least outline the facts constituting alleged violations). Because plaintiff has failed to identify any rights or facts that would amount to a violation of some right which the individually named defendant has violated, these claims must be dismissed on that basis alone. Such a deficiency is fatal to the complaint.

Here, plaintiff does not complain about not being able to return to employment as a Springfield teacher. (Bazinet Depo. p. 61)

51102

He complains that, when seeking employment subsequent to his work in Springfield, he went to a job interview in another School District, which he describes as favorable, and then contends that he did not get the job, apparently alleging that the information contained in his personnel file was disclosed to the potential employer, causing the potential employer to change his mind. (Bazinet Depo. pp. 57-58).

Viewing such claims in a light most favorable to plaintiff, defense counsel assumes plaintiff is asserting a due process claim, alleging a protected liberty interest in his reputation.

A public employer's action may deprive an employee of a constitutionally protected liberty interest in his or her reputation under circumstances first identified in *Paul v. Davis,* 424 U.S. 693, 710-12, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). The First Circuit interpreted [*Paul's*] requirements in *Beitzell v. Jeffrey,* 643 F.2d 870 (1st Cir.1981), stating that "the Fourteenth Amendment procedurally protects reputation only where (1) government action threatens it, (2) with unusually serious harm, (3) as evidenced by the fact that employment (or some other right or status) is affected." *Id.* at 878 (footnote and citations omitted).

Moreover, the municipality terminating the employee must also be responsible for the dissemination of defamatory charges, in a formal setting (and not merely as the result of unauthorized "leaks"), and thereby significantly have interfered with the employee's ability to find future employment. *Id.* at 879. See also *Silva v. Worden,* 130 F.3d 26, 32-33 (1st Cir.1997) (holding that under both the federal constitution and more favorable Massachusetts state law, directed verdict for defendant employer was appropriate when plaintiff produced no evidence that defendant disseminated information about the reasons for plaintiff's termination).

Here, plaintiff claims that a communication by someone in the school department of

51102

the allegations against him can be inferred, while there is no evidence of any statements made to any potential employer (or anyone outside the School Department) by any City employee. Plaintiff does not even allege that Burke made any statements to anyone. (Depo pp.55 – 59) As previously noted in the deposition testimony:

```
13         Q.    And what does Dr. Burke have to do with
14      that?
17         A.    Nothing.
```

Absent dissemination--the means by which an employee's reputation might be threatened with serious harm--a terminated public employee has no constitutional right to a name-clearing hearing. Because there is no evidence that Burke disseminated, and plaintiff does not allege, or present any evidence of, conduct by Burke or anyone at his direction that, if proven, would constitute a deprivation of any constitutionally protected liberty interest, defendant is entitled to entry of judgment in his favor. See *Dasey v. Anderson* 304 F.3d 148  (1st Cir. 2002).

While no state law pendent claim is asserted, its application is discussed here in the context of thorough analysis of plaintiff's claims. In Massachusetts, defamation is "the intentional or reckless publication, without privilege to do so, of a false statement of fact which causes damage to the plaintiff's reputation." *Elicer v. Toys "R" Us, Inc.,* 130 F.Supp.2d 307, 310 (D.Mass.2001) (citing *Correllas v. Viveiros,* 410 Mass. 314, 572 N.E.2d 7, 10 (Mass.1991). Typically, the statement must "discredit the plaintiff in the minds of any considerable and respectable segment of the community." *Draghetti v. Chimelewski,* 416 Mass. 808, 626 N.E.2d 862, 866 (Mass.1994) (citations and internal quotation marks omitted). "There is no requirement ... 'that the defamatory matter be communicated to a large or even substantial group of persons. It is enough that it is

51102

communicated to a single individual other than the one defamed.'" *Brauer v. Globe Newspaper Co.,* 351 Mass. 53, 217 N.E.2d 736, 739 (Mass.1966) (quoting Restatement of Torts § 577; further citations omitted).

An employer enjoys a "conditional privilege" to communicate information about its employees that might ordinarily be considered defamatory if the communication is "reasonably necessary to serve [the employer]'s legitimate interest in the fitness of [the employee] to perform his ... job." *Foley v. Polaroid Corp.,* 400 Mass. 82, 508 N.E.2d 72, 79 (Mass.1987) (citation and internal quotation marks omitted). This privilege is extended to include "a narrow group of individuals who share a common interest in the communication." *Masso v. United Parcel Service of America,* 884 F.Supp. 610, 622 (D.Mass.1995). Nonetheless, such a privilege is lost if the employer acts recklessly in publishing the information. *See Bratt v. Int'l Bus. Mach. Corp.,* 392 Mass. 508, 467 N.E.2d 126, 131-33 (Mass.1984).

Here, the allegedly defamatory information is supposedly contained in statements held in plaintiff's personnel file. There is no indication that the personnel file was ever disseminated to anyone outside of the School Department. Plaintiff claims that dissemination of information from the file can be inferred by an alleged change in attitude by a prospective employer when he was seeking a teaching job in 2004.

Even assuming that the file contained documents with false information that could possibly be the basis for a defamation claim, there has been no discovery provided to defense counsel which indicates any information contained in the files was ever disseminated, particularly by Doctor Burke or as a result of his direction. Even if it was disseminated, there is no evidence that such dissemination was "recklessly" published or is causally related to the plaintiff not obtaining employment two years ago. Under these

51102

circumstances, dismissal of the complaint is warranted.

While the complaint need only set forth a generalized statement of facts, plaintiff must provide enough information to outline the elements of his claim. *McGrath v. Macdonald*, 853 F. Supp. 1, 3 (D. Mass 1994) (*quoting Kadar Corp. v. Milbury,* 549 F. 2d 230, 233 (1st Cir. 1977). Since plaintiff has identified no right which the defendants are alleged to have violated, his civil rights claims are deficient as a matter of law. *The Dartmouth Review v. Dartmouth College,* 889 F. 2d 13, 16 (1st Cir. 1989) (civil rights complaint insufficient when based upon bald assertions, unsupportable conclusions) (*quoting Chonquis v. Board of Appeal*s, 811 F. 2d 36, 37 (1st Cir.) *cert. denied*, 483 U.S. 1021 ( 1987)). Because plaintiff has failed to establish any state claims against the defendant, this Court must dismiss the complaint in its entirety.

> **2.) Civil Rights Claims against the defendant must be dismissed because he cannot be liable for civil rights violation on the basis of supervisory liability.**

Even under a theory of *respondeat superior* liability, plaintiff still would not prevail; section 1983 does not permit recovery under such a theory against the defendant. Plaintiff attempts to assert unspecified claims against the defendant, which seem to be based on his employment status as superintendent. But public officials cannot be held liable for monetary damages in a civil rights action for deprivation of constitutional rights under color of state law purely for an alleged failure to exercise proper supervisory control over their subordinates. *Delaney v. Dias*, 415 F. Supp. 1353 (D. Mass. 1976); *see also, e.g., Darul-Islam v. Dubois*, F. Supp, 1998 WL 113942 (D. Mass.) 1998) (supervisory liability under 42 U.S.C. Section 1983 cannot… be premised on a theory of *respondeat superior*... or on a simple failure to exercise proper supervisory control), *citing, inter alia, Monell v.*

51102

*Department of Social Service*, 436 U.S. 658, 691 ( 1987); *Stourte v. Berman*, 55 F. Supp. 507, 511 (D. Mass. 1982).

A supervisor may only be found liable by his own acts or omissions. *Darul- Islam v. Dubois*, F. Supp, 1998 WL 113942 at 3, *citing Figueroa v. Aponte-Roque*, 864 F. 2d 947, 953 (1st Cir. 1989); see also, e.g. *Maldonando- Denis v. Castillo Rodriguez*, 23 F. 2d 576, 581 (1st Cir. 1994) (42 U.S.C. Section 1983 requires allegations and proof of personal involvement in the alleged constitutional deprivation as a prerequisite to recovery). Under certain circumstances, a supervisor's deliberate indifference, coupled with a sufficient casual nexus (supervisor knows of, approved of or purposefully disregarded subordinate's conduct violative of plaintiff's civil rights) might suffice for the imposition of civil rights liability. *e.g. Maldonado-Denis*, 23 F. 3d at 582. But not only does plaintiff fail to make such allegations against the defendant (in his supervisory position), he fails to identify any facts to support his conclusions or even any constitutional rights which they or any subordinate violated. Moreover, plaintiff's failure to allege any constitutional violation, never mind a violation which could support supervisory liability, is fatal to his claims.

What bare facts he does allege seem to be directed toward negligence theories. But "proof of mere negligence, without more, is inadequate to ground supervisory liability. *Id. citing, inter alia, Febus – Rodriguez v. Betancourt - Lebron,* 14 F. 3d 87, 91 (1st Cir. 1994). Plaintiff's claims against the defendant in his supervisory positions must be dismissed. Moreover, there is no evidence of compliance with the Massachusetts Tort Claims Act requirements of presentation which are a prerequisite to suit. See. G.L. c. 258, § 4.

51102

> **3.)  This court must dismiss any claims, which purports to allege a civil conspiracy because plaintiff has failed to state a claim for which relief may be granted.**

Any conspiracy claims against the Superintendent must be dismissed for failure to state a claim. In support of what can be loosely interpreted as a conspiracy claim against the defendant, plaintiff testified at his deposition that he was "targeted" by the Principal he worked under, Ms. Budd-Jackson. (Deposition pp. 35 – 37)

The defendant Burke is not alleged to have participated in any "conspiracy" or targeting. Burke should not be required to respond at trial to the assertion of such a claim, within the context of this civil proceeding. Presuming that plaintiff is attempting to assert a claim for civil rights conspiracy, the defendant submits that, despite the suggestion of a conspiracy, plaintiff has failed to adequately plead specific facts that would support the existence of a civil rights conspiracy which implicates Dr. Burke. *See generally, Leonardo v. Moran*, 611 F. 2d 397, 398 (1st Cir. 1979) (discussing the pleading requirements of conspiracy claim). The complaint must state with specificity the facts that would demonstrate the existence and scope of the alleged conspiracy. *Slotnick v. Staviskey*, 560 F. 2d 31, 33 (1st Cir. 1977). The complaint must "state with specificity the facts that, in the plaintiff's mind, show the existence and scope of the alleged conspiracy… It has long been the law… that complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts." *Id*.

As noted in the above discussion, allegations of conspiracy are not aimed at Dr. Burke. Bare assertions are insufficient to allege a claim for conspiracy against Dr. Burke. *Kadar Corp.,* 549 F. 2d at 233. Therefore, to the extent that civil rights conspiracy claims

51102

against the defendant are intended, they must be dismissed for failure to state a claim.

## CONCLUSION

Based on the above arguments, defendant respectfully requests that his motion for summary judgment be ALLOWED.

Respectfully submitted,

Defendant Joseph D. Burke,
Superintendent of Schools
By His Attorney

S / S  Edward M. Pikula

_____

Edward M. Pikula
City Solicitor
BBO #399770
CITY OF SPRINGFIELD LAW DEPARTMENT
36 Court Street
Springfield, Massachusetts 01103
Telephone:	(413) 787-6085
Telefax:	(413) 787-6173

**CERTIFICATE OF SERVICE**
The undersigned hereby certifies that a true copy of the within Defendant's Respoonse was this day served upon Plaintiff by mailing copy of same to:
Raymond Bazinet
56 Elm Street #38
Enfield, CT 06082 SIGNED under the pains and penalties of perjury.
 Dated:    3/2/2006
 S / S Edward M. Pikula, Esquire

51102