# United States District Court
# District of Massachusetts

**RAYMOND BAZINET,**
PLAINTIFF,

v.

**DR. JOSEPH P. BURKE,**
**SUPERINTENDENT OF SCHOOLS,**
DEFENDANT.

**CIVIL ACTION NO.  05-40041-MAP**

---

**DEFENDANT'S**
**STATEMENT OF MATERIAL FACTS**

---

1. This action was filed pro se on March 2, 2005, seeking "redress against Dr. Joseph P. Burke for civil rights violations of a nature that are covered under federal statutes to protect the general population and in particular, people that are employees of a public school." (Complaint ¶ 1)

2. The complaint alleges "Plaintiff was a teacher in Massachusetts at the time of the fallacious complaints and the improper insertion in his file." (¶ 2)

3. The complaint also alleges "retention of these fallacious documents (that the plaintiff was not able to ever see or rebut in a proper forum, even after the plaintiff pleaded with Dr. Burke in at least two letters. (see the attachment to the Complaint of letters sent to Dr. Burke ). And, that Dr. Burke was the superintendent at that school at that time and remains so today." (¶ 3)

4. Plaintiff was deposed in this matter on December 6, 2005. A copy of the transcript of the deposition is submitted herewith as Exhibit 1.

5. Copies of Documents from Bazinet's Personnel File were provided to him

in open court at a conference on 5/18/05 and are submitted herewith as
Exhibits 2- 20

6.  Bazinet was appointed to teach in Springfield as outlined in the letter of
8/1/01 letter of appointment to Bazinet from Burke (Ex. 2)

7.  The School Department received a complaint from a parent and scheduled
a meeting with Bazinet and administrator concerning the allegations, and
gave notice of Bazinet's right to have union representation, as set forth in
the 11/8/02 memo to Bazinet. (Ex. 3)

8.  In a 6/13/03 letter to Bazinet from Asst. Principal Doty memorializing
meeting with administrators concerning his evaluation, documenting two
hearings with Bazinet (10/22/02 and 11/12/02) regarding inappropriate use
of language and admission by Bazinet; and documenting a third hearing on
12/19/02. (Ex. 4)

9.  On 10/10/03 teacher observation reports indicate Bazinet's need for
improvement (Ex. 5)

10. In a 12/19/03 memo from Asst. Superintendent Coleman with directives on
same, Bazinet was counseled with regard to School Department homework
policy (Ex. 6)

11. As referenced in a 1/28/04 letter from Principal Budd-Jackson to Bazinet
received notice, opportunity to be heard, and right to representation with
administrators concerning teaching deficiencies and inappropriate sexual
comment. (Ex. 7)

12. On 2/9/04 Bazinet was notified with regard to a meeting with Asst.
Superintendent Coleman, Principal Jackson, and others concerning two

51103

alleged inappropriate statements, and his right to have representation. (Ex. 8)

13. On 2/12/04 Principal Budd-Jackson wrote to Bazinet requesting a written explanation concerning comments alleged to have been made by Plaintiff. (Ex. 9)

14. On 2/13/04 Bazinet wrote to the Principal explaining his comments pursuant to the investigation. (Ex. 10)

15. On 5/4/04 a notice was sent to Bazinet from Principal Budd-Jackson with regard to his absence. (Ex. 11)

16. On 5/12/04 notice to was sent to Bazinet that he would not be employed for school year beginning August 2004 (Ex. 12)

17. On 5/18/04 a letter was sent from Atty Sullivan to Dr. Burke concerning Bazinet's request for hearings on allegations. (Ex. 13)

18. On 5/20/04 Dr. Burke referred the letter to School Department Human Resource Administrator Connie O'Hare, Asst. Superintendent Coleman, and Principal Budd-Jackson for response (Ex. 14)

19. On 6/9/04 school department personnel gathered a packet of documents in response to the letter from Atty Sullivan. (Ex. 15)

20. On 6/23/04 Human Resource Administrator Connie O'Hare responde to to Attorney Sullivan. (Ex. 16)

21. Bazinet wrote a letter to Dr. Burke dated 7/18/04. (Ex. 17)

22. Human Resource Administrator O'Hare wrote to Bazinet 8/2/04. (Ex. 18)

23. Bazinet wrote a letter to Dr. Burke dated 11/1/04. (Ex. 19)

24. O'Hare provided a note on 11/3/04 to Dr. Burke written on copy of 8/2/04

letter. (Ex. 20)

25. Plaintiff acknowledges that he does not seek reinstatement. As he testified

in his deposition:

```
15          Q.    Now, if I understand you, you are not

16      contesting the right not to rehire you?

17          A.    No.   Why should I?  She has every right

18      not to rehire me.   That is not in dispute.   That is

19      a matter of like -- you are talking whatever, school

20      rules or stuff like that.   She -- she earned that

21      right, and I respect that right.   If she thinks I am

22      a lousy teacher, she gives me two bad reviews in a

23      row, you're history, that's life.
```

(Bazinet Depo p. 61).

26. Plaintiff does not articulate any particularized complaint, but appears to be

upset that two complaints were filed against him while he was teaching,

involving allegations of sexism and racism. At his deposition he

articulated his complaint as follows:

```
3           Q.    So if I understand -- so what is your

4       complaint?  Is your complaint that Dr. Burke refused

5       to meet with you?

6           A.    No, my complaint is that under federal

7       statute I am due a hearing.   I am still in the file

8       as a sexual predator and a racist.   They carry on to

9       this very day, the same problems that I have told

10      him about.   You cannot do this under federal

11      statute, as I understand it, without giving me a

12      hearing.   I need to confront the people, they need

13      to document what they are saying, and then I need to
```

```
14      show they are liars.
```

(Bazinet Depo. p. 59)

27. Despite Mr. Bazinet's claim that he is entitled to a "hearing" he acknowledged that he did not receive any discipline over either complaint. (Bazinet Depo p. 59-61).

28. Further, he acknowledges several meetings with school administrators concerning the allegations. For example, with regards to complaints that he was "racist", as noted in the attached Exhibit 7 *(Letter dated January 28, 2004 from Central High Administration Team to Mr. Bazinet)* after meeting with administrators, Mr. Bazinet agreed to refrain from using the alleged racist term in all his classes. Mr. Bazinet was afforded the opportunity for union representation but declined in favor of having his department chairperson present. Further the letter informed Mr. Bazinet that he should contact the administrators if he had any question concerning the statements he made.

29. Further, as noted in Exhibit 8 (*Letter Dated February 9, 2004 from Dr. Budd Jackson and Ms. Benoit to Mr. Bazinet)*Mr. Bazinet was notified of a meeting held on February 12, 2004 concerning the alleged statements he made to his class. The letter invited Mr. Bazinet to seek union representation. Bazinet attended and acknowledged in his deposition that he failed to file a union grievance. (Bazinet Depo. p. 45)

30. In Exhibit 9 (*Letter Dated February 12, 2004 from Dr. Budd Jackson to Mr. Bazinet)* Dr. Budd-Jackson requested a written explanation concerning the comments allegedly made by Mr. Bazinet.

51103

31. In Exhibit 10 (*Letter Dated February 13, 2004 from Mr. Bazinet to Dr. Budd Jackson*) Mr. Bazinet explained his comments and the allegations.

32. Bazinet complains that, when seeking employment subsequent to his work in Springfield, he went to a job interview in another School District, which he describes as favorable, and then contends that he did not get the job, apparently alleging that the information contained in his personnel file was disclosed to the potential employer, causing the potential employer to change his mind. (Bazinet Depo. pp. 57-58).

33. Viewing such claims in a light most favorable to plaintiff, defense counsel assumes plaintiff is asserting a due process claim, alleging a protected liberty interest in his reputation.

34. As noted in the following deposition testimony, Plaintiff apparently claims that a communication by someone from Central High School department of the allegations against him can be inferred. While there is no admissible evidence to support any such claims, plaintiff relies on totem pole hearsay statements he claims were made to him by an unidentified person at Central High School.

35. Not only is such evidence inadmissible, Plaintiff fails to allege that Burke made any statements or directed other to make any statements, positive or negative, to anyone.

```
2          Q.   Now, are you claiming damages against Dr.
3     Burke?
4          A.   Of course.  I've been damaged in many
5     ways; psychologically, emotionally, unable to secure
6     employment, probably.  I drove up to a school in the
```

51103

7      summer that year, and the guy needed a math teacher

8      bad.  They needed somebody who could teach science.

9      I can teach that.

10          Q.    What school?

11          A.    Offhand, --

12          Q.    What state was it in?

13          A.    Massachusetts.

14          Q.    What city was it in?

15          A.    Regional school up toward New Hampshire

16      border where I lived, which was going to be good

17      because I could stay in New Hampshire and teach

18      there.

19          Q.    And did you apply for a job there?

20          A.    I went in, I made out an application.

21      Somebody called the principal.  Rob Morrill is his

22      name.

                                                    56

1           Q.    He's the principal where, at the school

2       where you applied?

3           A.    Yep.  It will come to me.

4           Q.    All right.  And you say somebody called

5       the principal?

6           A.    Yeah.  I was filling out the application,

7       and you know how the personnel usually are really

8       good, they know everything that's going on in the

9       school, the regular personnel, clerks and whatever,

10      and somebody's always running that school from the

11      office anyway, because the principal doesn't have

12      time.  And they call them up, say "You need to come

13      out and talk to this guy".  He came out, we talked

14    for a couple minutes.  He says "Come in the office."

15    We talked for a half hour.  He knew me like I

16    couldn't believe.  And Damirscotta was where he was

17    from, and I had mispronounced the name, and he

18    corrected me.  And we talked about sports, we talked

19    about teaching.  We spent a good 20 minutes.  He

20    needed a special person, somebody that could walk in

21    the door -- this was a few days before opening --

22    teach some lower level kids and also do some science

23    stuff.  I can do science.  No good in the labs, but

24    I can do the science part, and I can do the math

57

1    part.  And, you know, very happy, he said "All I

2    need from you is you need to write a letter, because

3    I need it officially that you are applying for this

4    job, and bring it to me tomorrow."

5         Q.   And did you do that?

6         A.   I did.  I walked in the building, gave him

7    the letter.  I have a copy of it somewhere.  You

8    maybe even have it, I'm not sure.  And I said "Can I

9    see Mr. Morrill?"  And they said no, and they were

10    very different.  They were very cool to me.  And I

11    said "Is there a problem", and one of them indicated

12    that there was a problem, said "I think there is a

13    problem, and he's not willing to meet with you."

14    That's how they put it.  "He's not willing to meet

15    with you."  I said "Do you still want this letter",

16    they said, "Yeah, we'll take the letter".  Called

17    him.  No response.  Wrote to him.  No response.

18         Q.   And did you get a response to your letter?

19        A.   I did not.  My letter was a letter that

20   said I will accept the job, I am applying for the

21   job, blah, blah, blah.  That was the end of that.  I

22   called the school, apparently somebody down the

23   school, I can't say who it was --

24        Q.   You called what school?

58

1        A.   Central High.  And they said, "Well, yeah,

2   he called."  And he talked to the new principal

3   there, I forget his name.  He's the -- he's still a

4   principal there.

5        Q.   You made a call to Central High --

6        A.   Yeah.

7        Q.   -- to try to confirm whether --

8        A.   Yeah.  And I wanted to go see the

9   principal there, and they said, "No, he doesn't want

10   to see you", and they said that, yeah, Mr. Morrill

11   had called him.  That is all they could tell me.

12   And the principal didn't want to see me.

13        Q.   And what does Dr. Burke have to do with

14   that?

15        A.   Nothing.

36. There is no evidence that Burke disseminated, and plaintiff does not

allege, or present any evidence of, conduct by Burke or anyone at his

direction.

37. Here, the allegedly defamatory information is supposedly contained in

statements held in plaintiff's personnel file. There is no indication that the

personnel file was ever disseminated to anyone outside of the School

51103

Department. Plaintiff claims, as set forth in the above referenced deposition testimony, that dissemination of information from the file can be inferred by an alleged change in attitude by a prospective employer when he was seeking a teaching job in 2004.

38. Even assuming that the file contained documents with false information that could possibly be the basis for a defamation claim, there has been no discovery provided to defense counsel which indicates any information contained in the files was ever disseminated, particularly by Doctor Burke or at his direction.

39. Even if it was disseminated, there is no evidence that such dissemination was "recklessly" published or is causally related to the plaintiff not obtaining employment two years ago. Under these circumstances, dismissal of the complaint is warranted.

40. In support of what can be loosely interpreted as a conspiracy claim against the defendant, plaintiff testified at his deposition that he was "targeted" by the Principal he worked under, Ms. Budd-Jackson:

```
10          Q.   All right.  And this targeting that you
11     feel occurred --
12          A.   I didn't know at the time I was being
13     targeted.  I didn't know that he was in cahoots with
14     her, and I'm still not positive.  Only way I'll know
15     is if people come to court and answer truthfully.
16     That is the only way I'll know.  But it sure seems
17     it after adding up all the threats.  I did not come
18     to this conclusion until my third year.  And I
19     wasn't even sure of it then.  And now the further I
```

20    look into it, the more threads I see, the stronger

21    they are.  And they imply a conspiracy started by

22    Dr. Jackson abetted by subordinates who felt in her

23    debt or duty or whatever.  And that's what blew my

24    mind away that last day of school.

                                              36

1         Q.   What was the conspiracy, what was the

2    purpose of this conspiracy?

3         A.   You'd have to ask them.  I have no clue.

4    I think she just wanted to get me out.  She had

5    moved other people, I saw her do that, now that I

6    think about it.  And I wasn't moving.  I was very

7    happy with the math department, very happy with my

8    job.  If she wanted to cite me for not being a good

9    teacher, I had to accept that fact, and I was ready

10   to accept that fact.

11        Q.   Who were the conspirators?

12        A.   In my opinion it started with Dr. Jackson,

13   and the other ones could have been unwitting.

14        Q.   Who were the other ones?

15        A.   I would say Mr. Doty was probably one,

16   there was a vice president that died, he was

17   definitely one.  He burst in my classroom one day

18   for no ungodly reason and totally disrupted it and

19   scared the daylights out of the kids so that I had

20   to spend the next 15 minutes calming them down.  He

21   died.  I forget his name.

22        Q.   Were there any other conspirators?

23        A.   Let's see.  The assistant superintendent

24   would have to be, because he came in the third year.

37

```
 1        Q.   Who was that?

 2        A.   Since the second year didn't work, the

 3   third year would have been when she brought in the

 4   assistant superintendent, which really shocked me.

 5        Q.   Who was the assistant superintendent

 6   that --

 7        A.   I have no idea what his name is.  Black

 8   fellow.  Very nice guy.

 9        Q.   Mr. Coleman?

10        A.   Mr. Coleman.  He was the last year of

11   retirement.  I can see why he did it, what the heck,

12   he's retiring in December.  His friend.

13        Q.   And what did he do to --

14        A.   He didn't do anything to me except accuse

15   me of being a racist, said he was investigating it.

16   I said "fine, investigate it".
```

41. The defendant Burke is not alleged to have participated in any

"conspiracy" or targeting, and cannot respond to the assertion of such a

claim, within the context of this civil proceeding.

Respectfully submitted,

Defendant Joseph D. Burke,
Superintendent of Schools

S / S  Edward M. Pikula

_____

Edward M. Pikula
City Solicitor
BBO #399770
CITY OF SPRINGFIELD LAW DEPARTMENT
36 Court Street
Springfield, Massachusetts 01103
Telephone:      (413) 787-6085
Telefax:        (413) 787-6173